IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

EMILY TVRDY and AMANDA MUSILEK,

Plaintiffs,

v.

MICHAEL HILGERS and ASHLEY NEWMYER, in their official capacities,

Defendants.

**4:26CV3189**

**MEMORANDUM AND ORDER**

This matter is before the Court on plaintiffs Emily Tvrdy and Amanda Musilek's (together, the "plaintiffs") motion for a preliminary injunction (Filing No. 7) enjoining defendants Michael Hilgers, in his official capacity as Attorney General of the State of Nebraska, and Ashley Newmyer, in her official capacity as Director of the Division of Public Health for the Nebraska Department of Health and Human Services (together, the "defendants"), from enforcing Neb. Rev. Stat. § 38-613(3)(b) while this action is pending. *See* Fed. R. Civ. P. 65(a). For the reasons explained below, that motion is denied.

## I. BACKGROUND

The plaintiffs are both pregnant mothers and Nebraska residents who desire to give birth at home with the assistance of a certified nurse midwife ("CNM") because of their religious beliefs. But Nebraska's Certified Nurse Midwifery Practice Act (the "Act"), Neb. Rev. Stat. § 38-601 *et seq.*, prohibits CNMs from attending home births. *See* Neb. Rev. Stat. § 38-613(3)(b). A CNM may only perform "authorized medical functions" in "a licensed or certified health care facility," "[w]ithin an organized public health agency," or "[i]n the primary office of a licensed practitioner or in any setting authorized by the collaborating licensed practitioner, except that a certified nurse midwife shall not attend a home delivery." *Id.* § 38-613(3), (a)-(c).

The Act does not prohibit physicians or physician assistants ("PAs") from attending home births, nor does it prohibit unassisted home births. And if a physician chose to attend a home birth, a CNM could assist the physician. But a CNM may not attend a home birth alone. That is the type of home birth the plaintiffs allege their sincerely held religious beliefs have led them to choose.

The plaintiffs assert they are devout, practicing Christians. Their religious beliefs "inform [their] views regarding childbirth and motherhood" (Filing No. 1). They explain there are "two religious commitments" at play here. The first is that childbirth "should occur in a manner consistent with their convictions regarding family life, maternal responsibility, and the proper exercise of parental judgment" (Filing No. 8). Those convictions include their beliefs that "children are gifts from God and that parents are entrusted with the responsibility to make conscientious decisions regarding childbirth" and "the welfare of their children" (Filing No. 8).

The second is that they have a "religious obligation to act as faithful stewards of the lives and health of both mother and child by taking reasonable measures to promote safety during labor and delivery" (Filing No. 8). In their view, neither a hospital birth nor an unassisted home birth allows them to honor both commitments. They believe a CNM-attended home birth does.

The plaintiffs filed this action on June 23, 2026 (Filing No. 1). They allege the Act violates their rights under (1) the First Freedom Act (the "Freedom Act"), Neb. Rev. Stat. § 20-701 *et seq.*, (2) the Free Exercise Clause of the First Amendment to the United States Constitution, U.S. Const. amend. I, and (3) the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, § 1. Shortly thereafter, they moved for a preliminary injunction (Filing No. 7) based on their Freedom Act and Free Exercise claims.

## II. DISCUSSION

### A. Standard of Review

"A preliminary injunction is an extraordinary remedy," and the movant bears the burden of showing that it is warranted. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citations omitted). The Court has considerable discretion in determining whether to grant such relief. *See Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022).

In deciding whether to exercise that discretion, the Court considers four factors: "(1) the threat of irreparable harm to the movant;" (2) the "balance between this harm and the injury" an injunction would inflict on other parties; (3) "the probability that [the] movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). The "balance-of-harms and public-interest factors merge when" (as here) the plaintiffs are seeking a preliminary injunction against "state official[s] in [their] official capacit[ies]." *Eggers v. Evnen*, 48 F.4th 561, 564-65 (8th Cir. 2022) (internal quotation marks omitted).

The Eighth Circuit has cautioned that "no single [*Dataphase*] factor is determinative." *Schmitt v. Rebertus*, 148 F.4th 958, 966 (8th Cir. 2025); *accord Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013). But in practice, two factors do much of the work: irreparable harm and the likelihood of success of the merits.

Failure to show irreparable harm is an "independently sufficient basis upon which to deny a preliminary injunction." *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 893 (8th Cir. 2024) (quoting *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021)). "Indeed, in some cases, lack of irreparable injury is the factor that should begin and end the *Dataphase* analysis." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 n.5 (8th Cir. 2008).

The same is true for the likelihood-of-success factor. At times, the Eighth Circuit has called this factor "the most significant." *Schmitt*, 148 F.4th at 966. And "where a duly

enacted statute is involved, a likelihood of success on the merits may be characterized as . . . [a] threshold showing that must be met by a movant for a preliminary injunction." *Rounds*, 530 F.3d at 732 n.5. If the movant makes that "threshold showing," "the district court should then proceed to weigh the other *Dataphase* factors." *Id.* at 732. But if they don't, the Court "need not address the remaining *Dataphase* factors." *Id.* at 737 (declining to address the remaining factors because the movant failed to establish likelihood of success on its compelled speech claim). This is because "the remaining *Dataphase* factors cannot tip the balance of harms in the movant's favor when the [likelihood-of-success-on-the-merits] requirement is not satisfied." *Id.* 737 n.11; *see also Eggers*, 48 F.4th at 566 (explaining that a plaintiff's failure to establish "the likelihood-of-success factor is fatal" to a motion seeking to enjoin "the enforcement of a state statute").

**B. Likelihood of Success on the Merits**

"There are two standards a district court may apply when assessing a movant's probability of success on the merits." *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019). "Ordinarily, a party need only show a 'fair chance' of success on the merits." *Missouri v. Trump*, 128 F.4th 979, 991 (8th Cir. 2025) (quoting *Eggers*, 48 F.4th at 565). The fair-chance standard does not require the movant to show that they have a "greater than fifty per cent likelihood" of success, *Bao Xiong*, 917 F.3d at 999, only that their claims provide "fair ground for litigation," *Watkins*, 346 F.3d at 844. But if the movant seeks to enjoin "government action based on presumptively reasoned democratic processes, it must show that [it] is likely to prevail on the merits." *Missouri*, 128 F.4th at 991 (internal quotation marks omitted) (quoting *Eggers*, 48 F.4th at 565). That standard is "more rigorous." *Bao Xiong*, 917 F.3d at 999. Here, the challenged law is a "duly enacted state statute" so the heightened likely-to-prevail standard applies. *See id.* at 1000.

**1. Freedom Act**

Under the Freedom Act, if a "state action" "[s]ubstantially burden[s] a person's right to the exercise of religion," the state must then demonstrate "that applying the burden to

that person's" specific exercise of religion is not only "essential to further a compelling governmental interest" but also "the least restrictive means of furthering that" interest. Neb. Rev. Stat. § 20-703. If the state can't make that showing, then the state action violates the Freedom Act. *See id.* The plaintiffs argue that the ban on CNM-attended home births violates their rights under the Freedom Act because it substantially burdens their religious exercise without a compelling governmental interest to justify the ban. *See id.*

The Freedom Act defines "exercise of religion" broadly to include "any action that is motivated by a sincerely held religious belief, whether or not the exercise is compulsory or central to a larger system of religious belief." *Id.* § 20-702(1). It likewise defines "substantially burden" broadly. The term encompasses any action that "directly or indirectly constrains, inhibits, curtails, or denies the exercise of religion by any person or compels any action contrary to a person's exercise of religion." *Id.* § 20-702(6)(a). A substantial burden includes, among other things, "withholding benefits, imposing criminal, civil, or administrative penalties or damages." *Id.* § 20-702(b). Taken together, these definitions cast a wide net. To establish that state action substantially burdens their religious exercise, a plaintiff need only show that it "indirectly constrain[s]" an action "motivated by a sincerely held religious belief." *See id.* § 20-702. There is no requirement that the action be compulsory or central to a larger religious system. *See id.*

The defendants argue that the plaintiffs have failed to allege "that their religious beliefs *require* them to have a CNM-assisted homebirth" (Filing No. 15). Perhaps. But under the plain text of the Freedom Act, the "exercise of religion" covers "any action" that is simply "motivated" by a "sincerely held belief"—"whether or not" that action is "compulsory." Neb. Rev. Stat. § 20-702(1). The plaintiffs do not have to show that their religious beliefs require a particular action, only that they *motivate* a particular action. *See id.* § 20-702(1) (emphasis added).

The defendants also argue the Act does not prevent the plaintiffs from giving birth in a manner consistent with their beliefs because they could have a physician or PA attend

their home births. Again, maybe. But state action that even "indirectly" limits an action that is "motivated by a sincerely held religious belief," *id.* § 20-702(1), (6)(a), constitutes substantially burdening a person's right to the exercise of religion, *id.* § 20-703(1). Pointing out that the Act only inhibits some, but not all, actions motivated by sincerely held beliefs is unpersuasive in the face of the Freedom Act's expansive protections. *See id.* § 20-702(1), (6).

Given the overwhelming breadth of the Freedom Act, the plaintiffs can likely establish that their pursuit of a CNM-attended home birth is motivated by a sincerely held belief, and the CNM-restriction "indirectly" limits that action. Thus, the CNM-restriction substantially burdens the plaintiffs' religious exercise. So, whether the plaintiffs are likely to prevail on their Freedom Act claim boils down to whether the defendants (1) have a "compelling governmental interest" in restricting CNM-attended home births "in this particular instance," and (2) have employed the "least restrictive means of furthering" that interest. *Id.* § 20-703(a).

The Court concludes, at least at this preliminary stage, that the defendants have demonstrated the government has a compelling interest in protecting the health and safety of the plaintiffs and their children. *Cf. Neb. Dep't of Health v. Hinze*, 441 N.W.2d 593, 597-98 (Neb. 1989) (noting that the state has a "compelling interest in protecting the health and welfare of the citizens of Nebraska" in rejecting a First Amendment claim); *In re Interest of Anaya*, 758 N.W.2d 10, 22 (Neb. 2008) (holding that Nebraska's newborn screening statutes do not violate Nebraska's free-exercise-of-religion provisions).

The Act states a legislative purpose "to safeguard public life, health, safety, and welfare, to assure the highest degree of professional conduct by practitioners of certified nurse midwifery, and to insure the availability of high quality midwifery services to persons desiring such services." Neb. Rev. Stat. § 38-602. The defendants have also provided the declaration of Dr. Timothy Tesmer, Chief Medical Officer for the Nebraska Department of Health and Human Services (Filing No. 14-1). He reports "twice as many

perinatal deaths" and "three times as many neonatal seizures" occur in home births (Filing No. 14-1). At least two children have died in Nebraska in the last four years in home births attended by midwives. Based on these risks and others, the defendants point out the Nebraska legislature determined that physicians—not CNMs—are better equipped to handle emergency situations if they arise in a home-birth setting.

The Court also concludes that the defendants have demonstrated the Act's restriction on solo CNM-attended home births is the least restrictive means of furthering that compelling interest, as to both Nebraska mothers and children and as to the plaintiffs in this particular instance. The Act allows CNMs, under the provisions of a practice agreement, to "(1) attend cases of normal childbirth, (2) provide prenatal, intrapartum, and postpartum care, (3) provide normal obstetrical and gynecological services for women, and (4) provide care for the newborn immediately following birth." Neb. Rev. Stat. § 38-611. There are also exceptions for emergencies. *See id.* § 38-612. The Act does not prevent physicians or PAs from attending home births, and it does not prevent CNMs from attending births in birthing centers—low-intervention environments which aim to simulate the home-birth experience. In summary, the plaintiffs have not persuaded the Court that they are likely to prevail on their Freedom Act claim.

### 2. Free Exercise Clause

The plaintiffs' likelihood of success on their Free Exercise claim is even lower. The Free Exercise Clause provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof*." U.S. Const., amend. I (emphasis added). The free exercise of religion "often involves not only belief and profession but the performance of (or abstention from) physical acts[.]" *Empl. Div., Dep't of Human Resources of Or. v. Smith*, 494 U.S. 872, 877 (1990). But the clause does not constitutionalize every secular activity that a person undertakes for religiously motivated reasons. *See id.* at 878-79 ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate.").

The plaintiffs' sincerely held beliefs only get them so far. A "valid and neutral law of general applicability" does not violate a person's right of free exercise merely because it "proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.* at 879. Laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable. *See id.* at 878-82; *Fulton v. City of Philadelphia*, 593 U.S. 522, 533-34 (2021).

Here, the CNM-restriction applies regardless of a mother's religious beliefs or reasons for choosing a home birth. Nothing in the challenged provision distinguishes between religious and secular home births, and the plaintiffs do not allege that the state has exempted home births for secular reasons while prohibiting their religiously motivated home births. The Court agrees with the defendants that the Act is neutral and generally applicable. *See Smith*, 494 U.S. at 878-79.

As such, rational-basis review applies. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). And the Eighth Circuit has already stated that the Act clears rational-basis review. *See Swanson v. Hilgers*, 151 F.4th 992, 995 (8th Cir. 2025) (explaining that health and welfare laws "must be sustained if there is a rational basis on which the legislature could have thought it would serve legitimate state interests." (quoting *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 301 (2022))), *cert. denied*, 146 S. Ct. 1602 (2026). "The risks involved with delivery of a newborn make it rational for a legislature to require that back-up assistance and emergency facilities be readily available." *Id.* The Nebraska legislature "rationally could have believed that the Act would serve" legitimate health and welfare interests. *Id.* Moreover, requiring CNMs to operate under a physician's supervision "rationally furthers a legitimate state interest in ensuring that midwives safely perform the contemplated services." *Id.* As a result, the plaintiffs have not shown they are likely to prevail on their Free Exercise claim.

The plaintiffs argue that even if the law applies generally, strict scrutiny is still warranted because "certain categories of burdens on religious exercise warrant heightened

scrutiny because of the nature of interests affected" (Filing No. 8). The Court need not wade too deep into this argument because it has already concluded the government has a compelling interest and the Act is narrowly tailored to further that interest.

Given the plaintiffs' failure to establish they are likely to prevail on the merits of their Freedom Act and Free Exercise claims, the Court need not address the remaining *Dataphase* factors. *See Rounds*, 530 F.3d at 737-38. The Court's "consideration of the remaining *Dataphase* factors cannot tip the balance of harms in the [plaintiffs'] favor when the [likely-to-prevail] requirement is not satisfied." *Id.* at 737 n.11. Although "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Kirkeby v. Furness*, 52 F.3d 772, 775 (8th Cir. 1995) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)), without establishing a likelihood of success on the merits of their claims, the plaintiffs' "asserted threat of irreparable harm is correspondingly weakened in comparison to the State's (and the public's) interest" in protecting Nebraskan mothers and children from the risks associated with home childbirth. *Rounds*, 530 F.3d at 737 n.11. The plaintiffs' "failure to carry [their] burden on the likelihood-of-success factor is fatal to" their request for "an injunction against the enforcement of a state statute." *Eggers*, 48 F.4th at 566.

In light of the foregoing, plaintiffs Emily Tvrdy and Amanda Musilek's motion for a preliminary injunction (Filing No. 7) enjoining the enforcement of Neb. Rev. Stat. § 38-613(3)(b) is denied.

IT IS SO ORDERED.

Dated this 25th day of September 2026.

BY THE COURT:

s/ *Robert F. Rossiter, Jr.*
United States District Judge